D. Blair Clark, ISB No. 1367
Jeffrey P. Kaufman, ISB No. 8022
LAW OFFICE OF D. BLAIR CLARK PC
1509 Tyrell Lane, Suite 180
Boise, ID  83706
Phone: (208) 475-2050
Fax: (208) 475-2055
Email jeffrey@dbclarklaw.com
Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF IDAHO**

| In re:                                                      | Case No. 18-01287-TLM |
|---|---|
| **LAWRENCE WILLIAM ESQUIVEL, and TARA MICHELLE ESQUIVEL,** | Chapter 13 |
| Debtors. | |

**DEBTORS' CLOSING ARGUMENT**

COME NOW the Debtors, by and through their attorney of record, and hereby submit their Closing Argument regarding Debtors' Motion to Convert Case to Chapter 11, Chapter 13 Trustee's Motion to Convert Case to Chapter 7, and Washington Trust Bank's Motion to Convert Case to Chapter 7 or in the Alternative Dismiss as follows.

**I.     INTRODUCTION**

On December 12, 2018, Washington Trust Bank ("WTB") and the chapter 13 trustee moved to convert this case to one under Chapter 7, or in the alternative to Dismiss.  Docket Nos. 35 & 43.  Both the WTB and the chapter 13 trustee assert that the case should be converted to chapter 7 pursuant to § 1307(c) on the basis that Debtors lacked good faith in filing this case.  *Id*.

Debtors recognize that their noncontingent, liquidated and unsecured debts are above the chapter 13 debt limits, which prevents them from being debtors in this chapter 13 case. They therefore desire to proceed to reorganize under chapter 11. For the reasons asserted below, Debtors believe it is in the best interests of the estate, the creditors, and themselves that this case be proceed under chapter 11.

## II.     MATTER AT ISSUE

This Court is currently tasked with determining whether this case should proceed under chapter 11, under chapter 7, or be dismissed. Both the chapter 13 trustee and Washington Trust Bank ("WTB") prefer that this case proceed under chapter 7. WTB also desires that the case be dismissed if the Court determines not to convert the case to chapter 7. Debtors, however, desire to pursue a reorganization under chapter 11.

## III.    BAD FAITH STANDARD

In the Ninth Circuit, examining whether a case is filed in bad faith involves the application of the totality of the circumstances test. *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir. 1999). In applying this test, the Court should consider the following factors:

> (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his Chapter 13 petition or plan in an inequitable manner,
> (2) the debtor's history of filings and dismissals;
> (3) whether the debtor only intended to defeat state court litigation; and
> (4) whether egregious behavior is present.

*Id* (Internal citations and quotations omitted).

## III. CHAPTER 11 IS IN THE BEST INTERESTS OF THE ESTATE, CREDITORS AND DEBTORS

After enduring several months of WTB garnishing their wages, Debtors filed this case in an attempt to reorganize under chapter 13.[1] On or about December 3, 2018, it became evident that Debtors do not qualify for relief under chapter 13 because of the debt limits, which they surpass by approximately $28,000. Thereafter, on December 12th, the WTB and the trustee filed their motions. Debtors initially desired that the case be dismissed, Docket No. 47, however later withdrew their Motion to Dismiss, Docket No. 49, and filed their Motion to convert this case to chapter 11. Docket No. 50.

Under chapter 11, Debtors are capable of proposing a plan that satisfies the requirements of § 1129. They understand the monthly reporting requirements and the need for transparency in their financial lives. They testified that they are willing to undergo the scrutiny that comes with being an individual chapter 11 debtor.

While they have not yet formulated a specific plan of reorganization, they are willing to sell assets as may be necessary for a successful reorganization. Mr. Esquivel testified that he was willing to dissolve Daggett Woodworking, LLC, and contribute the proceeds to the plan. Additionally he testified that, if necessary, he would force the sale of his interest in 446/448

---

[1] In response to SOFA Question No 6, Debtors paid WTB approximately $16,690.34 in the 90 day period immediately prior the date they filed their case. Exhibit 101 (Docket No. 24), p 40. And in response to Question 10, WTB garnished approximately $21,672.03 in the 1 year period immediately prior to the date they filed their case. *Id* at p. 41.

Sinnex Ave, Pacific Grove, California (the "Sinnex Property").[2]  He also testified that he would seek out and collect his interest in any rental proceeds to which he is entitled.  Ms. Esquivel testified that due to current tension between the few shareholders, she is fearful of losing her position at Auto Claims Direct, Inc. ("ACD"), a closely held business.  Nonetheless, Ms. Esquivel testified that even though investigating the value of her interest in ACD may exacerbate those shareholder tensions, she would be willing to do so if necessary for the success of their reorganization.   Although she is a minority shareholder, her interest in the company does not guarantee employment with the company; employment which pays her, and a chapter 11 estate, a monthly gross income of just under $18,000 per month.

Granted it may appear that Debtors' equity exceeds their debts, that is not a certainty.  The value of Ms. Esquivel's interest in ACD is currently unknown.[3]  Additionally, the Sinnex Property has not been appraised, thus it is unclear what the market value may be; although it is centrally located on the Monterrey Peninsula in California, the condition of the property is not known.  Debtors are willing and able of performing the necessary research and investigation into the value of these assets.  They prefer, however, to have some control as to the method, process,

---

[2] The Court admitted as evidence Exhibits 217, 218, & 219.  In the aggregate these three exhibits only reflect that Mr. Esquivel owns an 18% in the Sinnex Property.  However, they demonstrate that Marjorie Green devised scheme to grant to Mr. Esquivel, his sister, and his parents this property in equal shares so that each ended up the same percentage interest.  While not in evidence, Debtors concede that a fourth deed exists and grants him (and his sister, and his parents) a seven percent interest, putting his and everyone else's interest at 25%.

[3] WTB contends that by listing ACD's value as unknown, Ms. Esquivel has attempted to "conceal" the value of her interest.  That is simply not true.  As Ms. Esquivel testified she does not know the value of ACD.  She should not be admonished for not knowing the value of her interest in a technology driven, closely held private corporation.

and order in which any potential liquidations occur. Something they would have very little control over if this case were converted to a chapter 7.

They believe that in a chapter 11 they can properly investigate the value of Ms. Esquivel's interest in ACD and Mr. Esquivel's interest in the Sinnex Property and structure a reorganization that pays their creditors in full, if required by § 1129(a)(7). Coupled with Ms. Esquivel's income, these debtors have the ability to propose a plan that provides a steady stream of repayment along with additional "lump-sum payments" that may occur with additional bonuses or shareholder dividends that Ms. Esquivel may receive, collection of the Sinnex Property rental proceeds, sale of Mr. Esquivel's interest in the Sinnex Property, and liquidation of Ms. Esquivel's interest in ACD.

Debtors anticipate that once a plan is approved, their creditors will begin to receive a stream of repayment. This stream of repayment is likely to incur before any distribution from a chapter bankruptcy estate - which typically issues payment after the trustee has collected the proceeds from the liquidation of assets, which can easily take more than a year.

Debtors would like the opportunity to protect their interests from involuntary liquidation if at all possible. They initiated this bankruptcy case with the intent to reorganize, and if allowed, they intend to do so.

**IV.    DEBTORS DID NOT FILE THEIR BANKRUPTCY PETITION IN BAD FAITH**

    A.    *The WTB Financial Statement.*

WTB and the trustee contend that Debtors acted in bad faith when Ms. Esquivel

submitted a written financial statement to WTB.  While the financial statement was admitted as evidence and Ms. Esquivel admitted she signed it the day after WTB funded the boat loan, that does not mean Ms. Esquivel knowingly submitted a false financial statement.  Ms. Esquivel's testimony at trial was that she submitted very little documentation to WTB - such as a credit application (Exhibit 129, pg 27) and maybe some paystubs or tax returns - but that Mr. Bohnenkamp was assisting them in obtaining the loan.  Both debtors testified that they believed they both were going to be borrowers on the boat loan, not just Ms. Esquivel.  They testified extensively how Mr. Bohnenkamp helped them obtain several loans on which both were liable.  That Ms. Esquivel signed a financial statement (after the funding of the loan) that contained incorrect information as to her alone is not indicia of the Debtors' bad faith <u>in filing their bankruptcy petition</u>.

      B.     *Failing to Voluntarily Repay Washington Trust Bank*

WTB argues that Debtors acted in bad faith when they did not voluntarily repay WTB after it obtained a judgment.  What WTB fails to consider is that Debtors here were victims of fraud committed by Christopher Bohnenkamp/Treasure Valley Marine/Bohnenkamp's Whitewater Customs - a man to who received approximately $198,000 to build a boat that was never delivered and stolen from them.  They defended themselves from suit with the understanding that WTB might have beared some of the blame for Mr. Bohnenkamps actions with regards to the boat loan.  While WTB ultimately obtained a judgment against Ms. Esquivel - there is no evidence that their defense of the suit was frivolous.

WTB initially obtained its Judgment in August 2017. Debtors filed this case nearly a year later after enduring several months of garnishments - which impacted their ability to repay other debts they had. There is no evidence that Debtors were concealing assets from WTB as it garnished Ms. Esquivel's wages. Other than not voluntarily paying back WTB, there is no evidence that Debtors obstructed WTB's attempts to collect on its judgment over the past year. Unlike what WTB may contend, this case was not filed to defeat state court litigation, which had already concluded.

    C.    *Knowledge of Mr. Esquivel's Interest in the Sinnex Property*

WTB makes a great deal about Ms. Esquivel's testimony at a 2017 debtor's exam about her knowledge of Mr. Esquivel's interest in the Sinnex Property. However, there is no evidence in the record that she had any direct knowledge of the extent of Mr. Esquivel's interest in the Sinnex Property.

Mr. Esquivel testified that he didn't learn that he had a legal interest in the Sinnex Property until the First Meeting of Creditors, when he was first presented a deed reflecting his 25% ownership. He testified that it was after that meeting that he called his father and looked into the matter. As reflected in Mr. Lawrence D. Esquivel's deposition, Exhibit 128, he always told his son that Mr. Esquivel did not have an interest in the Sinnex Property. Upon realizing that Mr. Esquivel had an interest in the Sinnex Property, Debtors amended their Schedule A/B to disclose that interest.

WTB contends there is a mountain of evidence that Mr. Esquivel knew of the extent of

his interest in the Sinnex Property - that claim is also false.  Mr. Esquivel was not present at Ms. Esquivel's 2017 debtors' exam.  There is no information suggesting he knew what stated at that exam.  Mr. Esquivel testified that it was after his discussions with his father after the First Meeting of Creditor that he remembered that he signed the power of attorney nearly 18 years ago at his parents direction as he was about to move to Arizona; he could not even recall much of the details regarding his execution of that document, let alone its significance.  WTB contends that Mr. Esquivel had knowledge of the contents of the WTB Financial statement, but there is no evidence to suggest he did - he did not sign it and was not a party to the loan.  When it comes down to it, Mr. Esquivel testified that although he had an interest in the property at the time they initiated this case, he was unaware that he did and once he believed he did, he acted in good faith and amended his Schedule A/B to reflect that interest.

   D. *Failing to Disclose Daggett Woodworking LLC's Bank Account*

WTB and the trustee appear to take issue with the fact that Debtors did not disclose Daggett Woodworking, LLC's bank account on their Schedules A/B.  The simple reason for this is because that bank account belongs to Daggett Woodworking, LLC, not the debtors.  Hence its omission from their schedules.  There is no evidence they ever attempted to conceal this account from anyone.  Failing to disclose Daggett Woodworking, LLC's assets is not indicia of bad faith.

   E. *Daughter's Bank Account*

Debtors admit that Ms. Esquivel and her daughter technically share a bank account.  However, Ms. Esquivel testified that she always considered that account as her daughters and

thus simply failed to include disclose it on their schedules A/B. This was not a purposeful omission and Ms. Esquivel furnished the trustee with statements for this account when requested by the trustee.

The trustee shows concern as to the transfers Debtors made to their daughter in the year prior to the debtors filing this case. Ms. Esquivel testified that she typically would transfer funds to her daughter so her daughter could purchase fuel to get to and from school and to buy groceries and other necessities. She testified that she also would transfer funds to this account to support her daughter's social outings, but after filing this case realized just how much they were actually paying on her daughter's behalf. Ms. Esquivel testified that they have reeled that in and have greatly reduced what they transfer to her daughter. Moreover, their budget does not reflect any unreasonable, line item sums being paid to her daughter - those expenses are absorbed into other items in their budget (like fuel, clothing, and food).

F.   Tax Returns

At trial the trustee questioned the debtors extensively about their tax returns. Debtors are not sophisticated people and testified that they relied upon their accountant's advice for completing their tax returns. If the trustee desires to challenge Debtors' tax returns, she should present her case to the appropriate taxing authorities, not to this court. That the trustee challenges the appropriateness of certain deductions within Debtors' tax returns does not amount to bad faith on the Debtors' behalf.

//

### G. Daggett Woodworking, LLC

WTB and the trustee assert that debtors acted in bad faith because Mr. Esquivel did not operate Daggett Woodworking, LLC during 2018. However, Mr. Esquivel testified that he was recovering from neck surgery during the first part of the year, which prevented him from operating the carpentry business. He also testified that Daggett Woodworking, LLC bid on a project and was expecting the gig, but the job went to another carpenter. He also testified that as he came to realize that a personal bankruptcy filing may be in their future, Daggett Woodworking, LLC remained idle so to prevent the ramifications of the bankruptcy from interrupting and canceling any jobs in which it may have been engaged. Mr. Esquivel simply did not want to start a job he could not finish.

### H. The Kubota Skidster

Mr. Esquivel testified that he not only used the Skidster in association with Daggett Woodworking, LLC, but also uses the machine for taking care of their residence. Debtors live in a mountainous region that gets snow on a regular basis throughout the year. This machine is used to clear the snow from their driveways and around their house. It is also used to clear out the mudslides that occur annually. Mr. Esquivel testified that the tractor they previously had was not able to take care of the mudslides. Further, although it was useful in clearing snow, the bodily movement required inside the cab was aggravating his neck injury and therefore the machine became difficult for him to use.

//

## IV.    CONCLUSION

After the application of the *Leavitt* factors, it cannot be said that under the totality of the circumstances, Debtors acted in bad faith in filing this case.  They have no history of filing and dismissing bankruptcy cases.  Nor have they demonstrated egregious behavior in this case, but have been forthright and open with what they know.  This case was filed to address all their debts, not just WTB's.  While their bankruptcy schedules initially contained some errors and omissions, such was not purposeful and they have attempted to promptly correct those mistakes.

For the foregoing reasons, Debtors request that the Court deny WTB's and the chapter 13 trustee's motions to convert this case to chapter 7 and Grant Debtors' motion to convert this case to chapter 11.  Alternatively, if the Court is not inclined to allow Debtors an opportunity to reorganize under chapter 11, then Debtors ask that the Court dismiss the case.

Dated this 6th day of February, 2019.

LAW OFFICE OF D. BLAIR CLARK PC

*/s/ Jeffrey P. Kaufman*
Jeffrey P. Kaufman,
Attorneys for the Debtors

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of February, 2019, caused to be served the foregoing to the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Office of the United States Trustee
ustp.region18.bs.ecf@usdoj.gov

Kathleen A. McCallister, Chapter 13 Trustee
kam@kam13trustee.com, kmccallister13@ecf.epiqsystems.com

Jesse A.P. Baker on behalf of Cenlar FSB
ecfidb@aldridgepite.com

Mark A. Ellingsen on behalf of Washington Trust Bank
mae@witherspoonkelley.com

I further certify that on this 6th day of February, 2019, I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:

Via first class mail, postage prepaid addressed as follows:
**None**

Via certified mail, return receipt requested, addressed as follows:

**None**

       */s/ Jeffrey P. Kaufman*
       Jeffrey P. Kaufman